**UNITED STATES of America**

v.

**Roselia Y. FAJARDO.**

**Crim. No. 85–124.**

United States District Court,
E.D. Louisiana.

April 8, 1985.

Robert Hamilton, Asst. U.S. Atty., New Orleans, La., for U.S.A.

James Wysocki, Robert Drouant, Bonnie Zakotnik, New Orleans, La., for defendant.

## ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the court pursuant to the provisions of 18 U.S.C. § 3145 on motion of defendant to review a detention order issued by United States Magistrate Ronald Fonseca on April 2, 1985. Considering the evidence adduced at prior proceedings in this matter, as well as the testimony adduced at the Court's April 4, 1985 hearing in this matter, the memoranda filed by the parties, and the applicable law, this Court affirms the Magistrate's Order and denys defendant's motion.

Defendant objects to the conditions imposed by the Magistrate on the grounds that the conditions so imposed are "penal in nature" in that the charged offense (31 U.S.C. § 5316) constitutes a misdemeanor punishable by a maximum term of imprisonment of one year and a fine of $1000 or both. Defendant is mistaken, the penalty provisions of 31 U.S.C. § 5322 were recently amended and the maximum penalties authorized for violations of 31 U.S.C. § 5316 now categorize that offense as a felony with maximum possible penalties of five years imprisonment and/or a fine of up to $250,000. *See* Comprehensive Crime Control Act of 1984, Public Law 98–473, Chapter IX, Section 901(b) (Oct. 12, 1984).

Defendant also contends that the Magistrate erred by not accepting the evidence that was offered by the defendant in support of defendant's argument that the sources of the $100,000 collateral would reasonably assure defendant's appearance at trial.

Pursuant to law [1], this Court reviewed this matter applying a de novo standard of review. And, according to stipulation of the parties, the Court listened to tapes of all prior proceedings in this matter [2]. The Court also conducted its own hearing to determine whether any condition or combination of conditions set forth in 18 U.S.C. § 3142(c) would reasonably assure the appearance of the defendant as required.

After reviewing tapes of the prior proceedings, and the evidence adduced at the Court's hearing, the court concludes as follows:

1. Defendant, Rosalia Farjardo, is a non-resident of this country.

2. She was temporarily in this country visiting friends at the time of her arrest.

3. Defendant has no ties to this country. She has no family in this district, is not employed here, and neither owns nor operates a business in this district, and owns no property in this district.

4. Additionally, defendant is the mother of two minor children residing in Belize, Central America, and it is natural to assume that she would not desire to be separated from them for an extended period of time.

5. She is a resident and citizen of Belize, Central America, charged with a violation of 31 U.S.C. § 5316, an offense that is not subject to extradition under the treaty presently in force between the United States and Belize.[3] In sum, defendant poses a serious flight risk.

6. The Magistrate initially set bond at $100,000 cash, surety or property, together with conditions that she submit to PSA supervision and that a third party assume custody of her pending completion of these proceedings. Within a few days after the amount of bond was set, a $10,000 check

---

1. *See, United States v. Beesley,* 601 F.Supp. 82 (N.D.Ga.1984).

2. *See* Tapes Nos. 85–15, –18, –22, –23, –24 (Courtroom #2) (over 4½ hours of proceedings).

3. *See* Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, June 8, 1972 & Oct. 21, 1976, 28 U.S.T. 229, T.I.A.S. No. 8468.

was given to a local bondsman as his fee for underwriting defendant's bond and $100,000 cash was transferred from a Panamanian Bank to a local bank in Jefferson Parish, which was to represent collateral to the bondsman for writing the bond.

7. The Magistrate conducted a hearing pursuant to 18 U.S.C. § 3142(g)(4) to determine the source of these funds. After failing to satisfactorily establish the source of these funds at the initial hearing,[4] the Magistrate continued the hearing to allow defendant further opportunity to prove the source of the funds.

8. At the subsequent hearing the defendant presented the affidavit Ms. Myrtle Sheran, the supposed source of the $100,-000, as well as unsworn letters from persons that claimed to be aquainted with the affiant, and knew her to be a person of good character. The defendant also introduced a "balance sheet" and will which defendant contends established the net worth of affiant and the source of the money used as collateral. *See* Defendant's Exhibits 1–11.

9. Mrs. Hunt, a local resident, initially agreed when speaking to the probation officer conducting a background investigation on defendant that she would be willing to serve as a third party custodian of the defendant and to place a mortgage on her residence to insure the performance of her obligation as a third party custodian. The probation officer has advised the Court that Mrs. Hunt is no longer willing to serve as third party custodian or to mortgage her home in connection with these proceedings.[5]

10. At the bond proceedings conducted in connection with defendant's initial appearance before the court defendant refused to advise the court as to how much cash she had either on hand or in a bank or savings institution.

Assuming arguendo that the documents submitted by defendant to show the source of the funds which comprised the $100,000 are credible, they likewise demonstrate that Ms. Sheran has considerable net worth and is a wealthy woman and could therefore provide a more substantial bond for her daughter-in-law. This is borne out by the apparent ease and the expeditious manner in which the $100,000 collateral and the $10,000 fee were furnished to the bondsman. Furthermore, the indicted offense carries a potential fine of $250,000 and setting a bond less than this amount under the circumstances of the case would create yet another incentive for the defendant to flee prior to the completion of these proceedings if she were in fact guilty.

The Court has also taken into consideration that both Magistrate Fonseca, and Mr. Tom Mallia, the Probation Officer assigned to this case, are of the opinion that a $100,-000 bond in this case is not sufficient to assure defendant's appearance in court. Magistrate Fonseca is a former United States Attorney with considerable experience in cases of this type, and Mr. Tom Mallia has had considerable experience both as a probation officer in this country, and in Panama, Canal Zone, and the Court knows him to be a fair minded person, well versed in these matters.

Subsection (c) of 18 U.S.C. § 3142 permits the court to cope with the problem of the increasing incidence of defendants in highly lucrative criminal activities who are able to meet high money bonds, posting bail and then fleeing the country. During the hearings on the Bail Reform Act of 1984 it was brought to the attention of Congress that there was a growing practice of those engaged in lucrative criminal

---

**4.** At this hearing defendant presented the testimony of Mr. Said Musa, a former attorney general of Belize, and the attorney for Ms. Sheran, the alleged source of the $100,000 collateral. On cross examination Mr. Musa declined to take third-party custody of the defendant and also admitted that he did not actually know what the source of the $100,000 collateral was, other than

the fact that it was wired from Panama to the United States per Ms. Sheran's instructions.

**5.** Ms. Hunt never testified. In fact, at no stage of the proceedings did the defendant present the testimony of any person willing to take third-party custody of the defendant, other than the testimony of the fully collateralized bondsman.

activities allocating a portion of their criminal income to cover the costs of avoiding prosecution. It is obvious that Congress intended to grant courts greater flexibility in fixing the amount of a bond high enough so as to deter those charged with crimes from surrendering a rather inconsequential sum, insofar as they were concerned, in an effort to place themselves beyond the jurisdiction of the court and thereby avoid standing trial.

This Court, in calling upon its experience of almost nine years in dealing with matters of this sort, is of the opinion under the circumstances of this case, that accepting a $100,000 bond with no third party custody other than a paid bondsman who has been fully collateralized and given $10,000 in addition, would be tantamount to suggesting that the Court accept $100,000 in lieu of proceeding with the criminal prosecution of this defendant.

Accordingly, the Court, in considering the above factors, finds that a bond in the amount of $500,000, together with the added conditions that (1) defendant submit to PSA supervision, and (2) remain in the custody of an acceptable (by this Court) third party, with the third party custodian furnishing a $50,000 mortgage to this Court to insure the faithful performance of his or her undertaking, will adequately assure defendant's appearance in court in connection with these proceedings.[6]

The defendant has already advised that she is unable to meet the conditions of this release. Accordingly, the Court finding there are no conditions which can be imposed to assure defendant's appearance other than those set forth above, denies defendant's motion and orders the defendant detained.

---

6. The Government's motion for detention without bond is denied.